# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

IN RE HANSEN MEDICAL, INC.   )
STOCKHOLDERS LITIGATION   )   C.A. No. 12316-VCMR

## MEMORANDUM OPINION

Date Submitted: March 6, 2018
Date Decided: June 18, 2018

Carmella P. Keener, ROSENTHAL, MONHAIT & GODDESS, P.A., Wilmington, Delaware; Carl L. Stine, Matthew Insley-Pruitt, and Adam J. Blander, WOLF POPPER LLP, New York, New York; *Lead Counsel for Plaintiffs.*

C. Barr Flinn, Kathaleen S. McCormick, Richard J. Thomas, and M. Paige Valeski, YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware; Tariq Mundiya, Benjamin P. McCallen, and Casey Donnelly, WILLKIE FARR & GALLAGHER LLP, New York, New York; *Attorneys for Defendants Jack W. Schuler, Jack W. Schuler Living Trust, Renate Schuler, Schuler Family Foundation, Tino Hans Schuler Trust, Tanya Eve Schuler Trust, Therese Heidi Schuler Trust, Larry N. Feinberg, Oracle Partners, L.P., Oracle Ten Fund Master, LP, Oracle Institutional Partners, L.P., the Feinberg Family Foundation, Oracle Investment Management, Inc. Employees' Retirement Plan, and Feinberg Family Trust*

Stephen C. Norman, Brian C. Ralston, and Jacqueline A. Rogers, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; Sara B. Brody, SIDLEY AUSTIN LLP, San Francisco, California; Matthew J. Dolan, SIDLEY AUSTIN LLP, Palo Alto, California; *Attorneys for Defendants Cary G. Vance and Christopher P. Lowe*

Raymond J. DiCamillo, Sarah A. Clark, and Ryan P. Durkin, RICHARDS, LAYTON & FINGER, P.A, Wilmington, Delaware; Rocky C. Tsai, ROPES & GRAY LLP, San Francisco, California; John D. Donovan, Jr., ROPES & GRAY LLP, Boston, Massachusetts; Martin J. Crisp, ROPES & GRAY LLP, New York, New York; Timothy R. Farrell, ROPES & GRAY LLP, Chicago, Illinois; *Attorneys for Defendant Auris Surgical Robotics, Inc.*

**MONTGOMERY-REEVES, Vice Chancellor.**

This case arises from a squeeze-out merger. The plaintiffs, representing a purported class of minority stockholders, allege that a group of significant stockholders, who together controlled more than fifty percent of the acquired company, used their control of the company to negotiate a beneficial deal for themselves at the expense of the minority stockholders. The defendants have moved to dismiss for failure to state a claim under Court of Chancery Rule 12(b)(6). When the Court of Chancery reviews whether a complaint has stated a claim for which relief can be granted, a fairly lenient standard of review applies. The Court must determine if it is reasonably conceivable, based on the well-pled facts in the complaint, that the plaintiffs can recover.

Under this somewhat lenient standard, the plaintiffs have pled sufficient facts to state a reasonably conceivable claim that a group of stockholders acted as a control group and extracted a different benefit for themselves from the merger transaction. Thus, the plaintiffs have overcome the Rule 12(b)(6) hurdle, and their claims, other than the aiding and abetting claim, survive the defendants' motions to dismiss.

## I. BACKGROUND

All facts are drawn from Plaintiffs' Verified Amended Consolidated Class Action Complaint (the "Complaint") and the documents incorporated therein.[1]

---

[1] *In re Morton's Rest. Gp., Inc. S'holders Litig.*, 74 A.3d 656, 658 n.3 (Del. Ch. 2013).

## A. Parties and Relevant Non-Parties

Hansen Medical Inc. ("Hansen" or the "Company") is a Delaware corporation, with principal executive offices in Mountain View, California.[2] It designs, develops, and markets medical robotics.[3]

Defendant Cary G. Vance ("Vance") served as President, Chief Executive Officer ("CEO"), and a director of the Company beginning on May 23, 2014.[4] Defendant Cristopher P. Lowe ("Lowe" together with Vance, the "Director Defendants") served as a director and interim Chief Financial Officer ("CFO") of the Company.[5] Lowe also served as interim CEO from February to May 2014.[6]

Defendant Jack W. Schuler controlled Jack W. Schuler Living Trust, Renate Schuler, Schuler Family Foundation, Tino Hans Schuler Trust, Tanya Eve Schuler Trust, and Therese Heidi Schuler Trust (collectively, "Schuler"), each of which were, at all relevant times, Hansen stockholders.[7] Schuler controlled approximately

---

[2]  Compl. ¶ 12. After being identified initially, individuals are referenced herein by their surnames without regard to formal titles such as "Doctor." No disrespect is intended.

[3]  *Id.*

[4]  *Id.* ¶ 13.

[5]  *Id.* ¶ 14.

[6]  *Id.*

[7]  *Id.* ¶ 16.

thirty-four percent of Hansen stock.[8]  Schuler served as a director of the Company from 2013 to January 12, 2016.[9]

Defendant Larry N. Feinberg, a Hansen stockholder, controlled Defendants Oracle Partners, L.P., Oracle Ten Fund Master, LP, Oracle Institutional Partners, L.P., Feinberg Family Foundation, Oracle Investment Management, Inc. Employees' Retirement Plan, and Feinberg Family Trust (collectively, "Feinberg" and together with Schuler, the "Controller Defendants").[10]  Feinberg controlled approximately thirty-one percent of Hansen stock.[11]

Defendant Auris Surgical Robotics, Inc. ("Auris") is a Delaware corporation based in Silicon Valley that designs and develops robotics for medical applications.[12] Auris is not publicly traded.[13]  Auris's co-founder and CEO is Hansen founder

---

[8]  *Id.*

[9]  *Id.*

[10]  *Id.* ¶ 17.

[11]  *Id.*

[12]  *Id.* ¶ 18.

[13]  *Id.*

Frederic Moll ("Moll").[14]  Moll has served as Chairman of the Board of Auris since June 2011.[15]

## B.    Facts

The Complaint incorporates by reference, and relies heavily upon, the Schedule 14A filed by Hansen on June 20, 2016 (the "Proxy"), which Defendants provided as an exhibit to one of the motions to dismiss.  The Complaint also incorporates and relies upon the Deposition of Cristopher P. Lowe, taken on July 8, 2016, in a different matter.  The parties did not submit the deposition with their filings.  Therefore, I include only the facts available in the Complaint and the Proxy.  As required when considering a motion to dismiss pursuant to Court of Chancery Rule 12(b)(6), I take all well-pled facts in the Complaint as true.  I address only the facts necessary to decide these Motions to Dismiss.

### 1.    The Controller Defendants' history

The Controller Defendants have been investing together since at least 1997. In 1997, the Controller Defendants filed a Schedule 13DA with the SEC "stating that 'they may be deemed to be a "group"' of stockholders in Quidel Corporation."[16] Today, the Controlling Defendants "control almost 25% of the Quidel Corporation's

---

[14]    *Id.*

[15]    *Id.*

[16]    *Id.* ¶ 36(a).

4

stock and Schuler is a member of the Board of Directors."[17] The Controlling Directors also both invested in Ventana Medical Systems ("Ventana"), and again, Schuler served on the Board of Directors.[18] When Roche Holdings bought out Ventana, Feinberg told Forbes.com that his "strategy [had] been to go along with [Schuler]."[19] The Controller Defendants both currently have substantial investments in Accelerate Diagnostics, Inc., Contrafact Corporation, and Vermillion, Inc., and they have in the past simultaneously owned large stakes in Mazor Robotics, Ltd., Transition Therapeutics, Inc., and Biolase, Inc.[20]

The Controller Defendants also have acted in concert when dealing with their Hansen holdings. In 2011, they both began their investments in Hansen by participating in a private placement.[21] They were the only participants in the transaction.[22] In August 2013, they again both participated in a private placement and increased their shares of Hansen.[23] In 2015, they again participated in a private

---

[17] *Id.*

[18] *Id.* ¶ 36(b).

[19] *Id.*

[20] *Id.* ¶¶ 36(e)-(f).

[21] *Id.* ¶ 32.

[22] *Id.*

[23] *Id.* ¶ 33.

5

placement and increased their shares.[24]  In both the 2013 and 2015 private placements, Hansen defined the Controller Defendants "together as 'Principal Purchasers,'" and in 2015, the Controller Defendants purchased substantially more stock than the other participants in the private placements.[25]  "As Principal Purchasers, the Controlling Defendants, acting together, had the right to determine the closing date, to oversee the press releases and other communications regarding the transactions, to extend the termination date under certain circumstances, and to amend the agreement.  These rights were not offered to the other investors."[26]

### 2.    Negotiating the Merger

Prior to the consummation of the merger transaction (the "Merger"), Hansen owed a creditor, White Oak Global Advisors, LLC ("White Oak"), $35.1 million (the "White Oak Debt").  Hansen's agreement with White Oak required it "to obtain an audit opinion from [its] independent certified public accountants on the annual financial statements that [did] not include a going concern qualification," and a going concern qualification was considered an event of default under the agreement.[27]  In the event of Hansen's default, White Oak could accelerate all

---

[24]    *Id.* ¶ 34.

[25]    *Id.* ¶ 35.

[26]    *Id.*

[27]    Dir. Defs.' Opening Br. Ex. A, at 30.

6

outstanding amounts and foreclose on "substantially all" of Hansen's assets, other than Hansen's intellectual property.[28] During the second half of 2015, Hansen became more and more concerned that it would receive a going concern qualification on its end of year financials, thus triggering a default of the White Oak Debt.[29]

By the end of September 2015, Hansen began discussions with Moll and "Company B" regarding potential transactions with Hansen.[30] "On September 24, a call was held between [Moll] and [Vance], during which they discussed potential collaboration arrangements and other strategic activities between [Auris and Hansen]."[31] On September 25, the CEO of Company B called Vance "to explore a potential acquisition of the Company or acquisition or licensing of certain . . . intellectual property assets."[32] On September 28, Hansen and Company B entered into a mutual confidentiality agreement.[33] On September 30, Moll "emailed an expression of interest letter from Auris to [Vance] and requested that the Company agree to a [60-day] exclusivity period. The letter contemplated a potential

---

[28] *Id.* at 31.

[29] *Id.*

[30] *Id.* at 36.

[31] *Id.*

[32] *Id.*

[33] *Id.*

acquisition of the Company or all or substantially all of its assets by Auris at a price to be agreed following due diligence."[34]

On October 1, Moll and Vance met in person for further discussions. "Moll requested the ability to communicate with . . . Jack Schuler, . . . Larry Feinberg and Lawrence Kennedy [(the "Key Stockholders")], to inquire as to the willingness of each of them to potentially invest in Auris and/or their willingness to support a potential transaction between Auris and the Company."[35] On October 2, Hansen's Board of Directors (the "Board") held a meeting and, in light of the discussions with Auris and Company B, created a transaction committee (the "Transaction Committee") "to assist management with the process of pursuing potential strategic alternatives for the Company and interviewing potential financial advisors to assist with such a transaction."[36]

The Board "appointed Marjorie L. Bowen, Michael L. Eagle, Stephen L. Newman and Jack Schuler to serve as members of the Transaction Committee."[37] "From October 2 through the time the Transaction Committee involved a financial advisor in the transaction on October 20, [Vance] and other members of the

---

[34]     *Id.*

[35]     *Id.*

[36]     *Id.*

[37]     *Id.*

8

Company's management regularly had discussions with potential counterparties to discuss a potential strategic transaction."[38]

On October 8, the Transaction Committee met and discussed "the fact that Auris had informed the Company that any proposal by Auris to acquire the Company might be conditioned on the Key Stockholders being required to invest in Auris an amount equal to all or a significant portion of their proceeds from such a transaction."[39] "On October 12, Auris provided the Company with a draft nondisclosure agreement among Auris, the Company and each of the Key Stockholders," and the Transaction Committee met again to discuss moving forward with Auris.[40] On October 15, Schuler and the Transaction Committee determined that Schuler "should not continue as a member of the Transaction Committee in light of the possibility that he might be required to invest in Auris, and he resigned from the committee."[41] Schuler, however, did not resign from the Board.

Between October 15, 2015 and January 12, 2016, the Transaction Committee, which became a special committee of independent directors (the "Special

---

[38] *Id.*

[39] *Id.* at 37.

[40] *Id.*

[41] *Id.*

Committee) on December 8, 2015,[42] held at least twelve meetings about the possible transactions that were attended by members of the Board who were not on the Transaction or Special Committee, including Schuler.[43] During this time, the Board, including Schuler, also held two meetings where they discussed possible transactions.[44] Schuler informed the Board on January 7, 2016 that he was considering resigning from the Board and proposing his own transaction with the Company.[45] He resigned on January 12,[46] but on February 4, Schuler informed the Company he would not be making an offer to Hansen.[47]

From January 15, 2016 to April 18, 2016, negotiations continued between Auris, the Company, and the Controller Defendants.[48] On April 19, the Special

---

[42]     *Id.* at 40.

[43]     *Id.* at 38-42. The Proxy explicitly notes that Schuler was excluded from two of these Board meetings, December 23 and January 8. *Id.* at 40, 41-42. The Proxy also notes that Schuler left a January 5 meeting after "an update on the discussions with Auris, Company B, other potential counterparties and the Key Stockholders." *Id.* at 41. These are the only meetings attended by "other members of the Board" where the Proxy states that Schuler was excluded or left at a certain time. Thus, it is reasonable to infer that Schuler attended the entirety of the other meetings.

[44]     *Id.* at 37, 40.

[45]     *Id.* at 41.

[46]     Compl. ¶ 16.

[47]     Dir. Defs.' Opening Br. Ex. A, at 44.

[48]     *Id.* at 42-47.

10

Committee voted unanimously to recommend the Merger to the Board.[49] The same day, the Board unanimously approved the Merger.[50] The ultimate terms of the Merger were as follows: stockholders received $4.00 per share; Auris assumed the White Oak Debt; and the Key Stockholders, plus any affiliates or entities with family connections, rolled over their shares into Auris.[51] The Merger was announced on April 20, 2016.[52]

### 3. Management projections in the Proxy

The Company engaged Perella Weinberg Partners LP ("Perella Weinberg") as its financial advisor in October 2015.[53] Perella Weinberg performed discounted cash flow analyses ("DCFs") to value Hansen.[54] Hansen's management provided three different projections to be used in the DCFs.[55] These projections were termed "Management Case 1," "Management Case 2," and "Management Case 3."[56] The

---

[49]     *Id.* at 47.

[50]     *Id.*

[51]     *Id.*

[52]     *Id.*

[53]     *Id.* at 38.

[54]     *Id.* at 58.

[55]     *Id.*

[56]     *Id.*

DCF using Management Case 1 showed a "range of implied present value per share" of $5.78-$7.68.[57] The DCF using Management Case 2 showed the range as $2.92-$4.05 per share, and the DCF using Management Case 3 showed $0.76-$1.34 per share.[58] "Lowe testified under oath that 'the case we came up with was actually case one, the 20 percent. That was the long-term growth rater [sic] that we harmonized in on.' The '20 percent growth was a reasonable assumption for the next five years.'"[59] When asked "why Hansen 'decided to do three different cases as opposed to just come up with one case,'" Lowe responded "that '[c]ase two and three is [sic] the case that keeps the CFO [i.e., himself] from looking stupid.'"[60] The Proxy did not disclose this information about managements' beliefs.

## II. ANALYSIS

Plaintiffs assert four claims. First, Plaintiffs assert a breach of fiduciary duty claim against Defendants Lowe, Vance, and Schuler. Second, Plaintiffs assert a breach of fiduciary duty claim against the Controller Defendants. Third, Plaintiffs assert a breach of fiduciary duty claim against Defendant Schuler as a *"de facto*

---

[57]     *Id.*

[58]     Compl. ¶ 100.

[59]     *Id.* ¶ 91.

[60]     *Id.* ¶¶ 91, 100 (alterations in original).

*Controlling Shareholder.*"[61]  Fourth and finally, Plaintiffs assert an aiding and abetting breaches of fiduciary duties claim against Auris.

Defendants, in their various Motions to Dismiss, respond in a variety of ways. First, Defendants disagree with Plaintiffs' contention that the Merger should be reviewed under the entire fairness standard because Defendants argue that there was not a control group or a controller.  Second, Defendant Schuler argues that he cannot be liable for any breaches of fiduciary duty because he resigned from the Board before the terms of the Merger were approved and because the Merger was approved by the Board and Hansen's stockholders.[62]  Third, the Director Defendants argue that Plaintiffs have failed to plead non-exculpated claims, and under *Corwin v. KKR Financial Holdings LLC,*[63] the business judgment rule should apply.[64]  Fourth and finally, Auris argues that Plaintiffs have not pled facts that show Auris "knowingly participated" in an underlying breach of fiduciary duty.

---

[61]    *Id.* at 66.

[62]    All of Schuler's arguments other than those based on the fact that he left the Board before the Merger was approved rest on the premise that there was no controlling stockholder.  As discussed below, I find that Plaintiffs have stated a reasonably conceivable claim that there was a control group, and thus, I do not consider Schuler's arguments premised on the lack of a controlling stockholder.

[63]    125 A.3d 304 (Del. 2015).

[64]    As discussed below, I find that Plaintiffs have stated a reasonably conceivable claim that the entire fairness standard of review should apply, so I do not address the *Corwin* argument asserted by the Director Defendants.

### A. Standard of Review

When considering a motion to dismiss for failure to state a claim under Court of Chancery Rule 12(b)(6), a court must accept all well-pled factual allegations in the complaint as true, accept even vague allegations in the complaint as well-pled if they provide the defendant notice of the claim, draw all reasonable inferences in favor of the non-moving party, and deny the motion unless the plaintiff could not recover "under any reasonably conceivable set of circumstances susceptible of proof."[65] These "pleading standards for purposes of a Rule 12(b)(6) motion 'are minimal,'" and the operative test is "one of 'reasonable conceivability,'" which asks "whether there is a 'possibility' of recovery."[66]

### B. Plaintiffs have stated a reasonably conceivable claim that the Merger should be considered under the entire fairness standard of review

Plaintiffs have stated a reasonably conceivable claim that the Merger should be considered under the entire fairness standard of review because it was a conflicted transaction involving a controlling stockholder. "When a transaction involving self-dealing by a controlling shareholder is challenged, the applicable standard of judicial

---

[65] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896-97 (Del. 2002).

[66] *In re China Agritech, Inc. S'holder Deriv. Litig.*, 2013 WL 2181514, at *23-24 (Del. Ch. May 21, 2013).

14

review is entire fairness, with the defendants having the burden of persuasion."[67] "Under current law, the entire fairness framework governs any transaction between a controller and the controlled corporation in which the controller receives a non-ratable benefit."[68] In other words, a transaction falls under the entire fairness framework when "the controller competes with the common stockholders for consideration . . . [and] takes a different form of consideration than the minority stockholders."[69] Plaintiffs argue that this circumstance applies to the Merger because the Controlling Defendants constituted a control group and received a different form of consideration than the minority stockholders, which lead to the minority stockholders being unfairly undercompensated.

There are two ways a stockholder can be considered a controller under Delaware law: "where the stockholder (1) owns more than 50% of the voting power of a corporation or (2) owns less than 50% of the voting power of the corporation

---

[67] *Ams. Mining Corp. v. Theriault*, 51 A.3d 1213, 1239 (Del. 2012).

[68] *In re Ezcorp Inc. Consulting Agreement Deriv. Litig.*, 2016 WL 301245, at *11 (Del. Ch. Jan. 25, 2016), *recons. granted in part*, 2016 WL 727771 (Del. Ch. Feb. 23, 2016) (ORDER).

[69] *IRA Trust FBO Bobbie Ahmed v. Crane*, 2017 WL 7053964, at *6 (citing *In re Crimson Expl. Inc. S'holder Litig.*, 2014 WL 5449419, at *12 (Del. Ch. Oct. 24, 2014) and *In re John Q. Hammons Hotels Ins. S'holder Litig.*, 2009 WL 3165613, at *7-8 (Del. Ch. Oct. 2, 2009)).

15

but 'exercises control over the business affairs of the corporation.'"[70] A controlling stockholder need not be a single person or entity. A group of stockholders may be deemed a "control group" and considered a controlling stockholder such that "its members owe fiduciary duties to their fellow shareholders. Proving a control group is . . . a fact-intensive inquiry that requires evidence of more than mere 'parallel interests.'"[71] It requires that the group of stockholders be "connected in some legally significant way—e.g., by contract, common ownership, agreement, or other arrangement—to work together toward a shared goal."[72] "The law does not require a formal written agreement, but there must be some indication of an actual agreement. Plaintiffs must allege more than mere concurrence of self-interest among certain stockholders to state a claim based on the existence of a control group."[73]

Because the analysis for whether a control group exists is fact intensive, it is particularly difficult to ascertain at the motion to dismiss stage when "dismissal is

---

[70] *In re KKR Fin. Hldgs. LLC S'holder Litig.*, 101 A.3d 980, 991 (Del. Ch. 2014) (quoting *Kahn v. Lynch Commc'n Sys., Inc.*, 638 A.2d 1110, 1113–14 (Del. 1994)), *aff'd sub nom*, *Corwin v. KKR Fin. Hldgs. LLC*, 125 A.3d 304 (Del. 2015).

[71] *In re Nine Sys. Corp. S'holder Litig.*, 2014 WL 4383127, at *24 (Del. Ch. Sept. 4, 2014).

[72] *Dubroff v. Wren Hldgs., LLC*, 2011 WL 5137175, at *3 (Del. Ch. Oct. 28, 2011) (quoting *Dubroff v. Wren Hldgs., LLC*, 2009 WL 1478697, at *3 (Del. Ch. May 22, 2009)).

[73] *In re Crimson*, 2014 WL 5449419, at *15 (citations omitted).

inappropriate unless the 'plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof.'"[74] "Although parallel interests alone are 'insufficient as a matter of law to support the inference that the shareholders were part of a control group,' . . . parallel interests, in addition to other facts alleged by [plaintiffs]," can support a reasonable, but not necessarily conclusive, inference that a control group existed. [75]

Plaintiffs point to *Frank v. Elgamal* for support that a control group existed in the instant case.[76] In *Frank*, this Court found that the plaintiffs had stated a reasonably conceivable claim that a control group existed when the complaint alleged "how all of the members of the Control group contemporaneously entered into the Voting Agreements, the Exchange Agreements, and the Employment Agreements."[77]

> Specifically, the Complaint describe[d] that on December 20, 2010, each member of the Control Group (1) agreed to vote his shares of American Surgical common stock in favor of the Merger, (2) exchanged some of his American Surgical common stock for an interest in the post-Merger entity, and (3) accepted employment with the post-Merger

---

[74] *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 168 (Del. 2006) (quoting *Savor, Inc.*, 812 A.2d at 896-97).

[75] *Zimmerman v. Crothall*, 2012 WL 707238, at *11 (Del. Ch. Mar. 27, 2012) (quoting *Dubroff*, 2011 WL 5137175, at *3).

[76] 2012 WL 1096090 (Del. Ch. Mar. 30, 2012).

[77] *Id.* at *8.

entity. It can reasonably be inferred, from that conduct, that the members of the Control Group were acting as American Surgical's controlling stockholder. Therefore, for purposes of a motion to dismiss, the Control Group was American Surgical's controlling stockholder.[78]

The Court of Chancery considered all the factors, the Voting Agreement, Exchange Agreements, and Employment Agreements, together in light of the broader picture. When all the facts were considered together at the motion to dismiss stage, they were enough to state a reasonably conceivable claim that a control group existed.[79]

---

[78] *Id.*

[79] *Id.* Defendants point to several cases, decided at the motion to dismiss stage, which they contend support their argument that no control group existed here. I find that these cases are all factually distinguishable from the instant case or actually support a finding that a control group existed here. *See, e.g.*, *In re Crimson.*, 2014 WL 5449419, at \*17 ("At this stage, however, all reasonable inferences must be drawn in favor of Plaintiffs, and they only need to show it is reasonably conceivable that Oaktree controlled Crimson. Having considered all of the allegations and the available record, I am hesitant to conclude that Plaintiffs could not conceivably make that showing. Regardless, as the next section shows, even assuming that Oaktree did control Crimson, entire fairness still does not apply in this case [because there was no conflicted transaction]."); *DiRienzo v. Lichtenstein*, 2013 WL 5503034, at \*25 (Del. Ch. Sept. 30, 2013) (finding that "the Complaint does not contain allegations that support a reasonable inference that Lichtenstein controlled the General Partner's independent and disinterested board as a majority unit holder, as member of a control group, or otherwise" where the complaint did "not allege that Lichtenstein owned a majority" of the units and only alleged that Lichtenstein controlled the day-to-day operations but not the majority independent board of directors who had no material financial interest in the challenged transaction); *Dubroff*, 2009 WL 1478697, at \*4 ("The Complaint states in conclusory fashion that the Entity Defendants 'controlled the NSC board of directors,' but the Complaint does not point to any facts that could explain how the Plaintiffs would expect the Court to arrive at that conclusion."); *Feldman v. Cutaia*, 956 A.2d 644, 657-58 (Del. Ch. 2007) (finding no control group when the complaint only alleged that the board members and their families controlled 60% of the company's equity but did not allege any agreement or "blood pact" between them), *aff'd*, 951 A.2d 727 (Del.

Plaintiffs argue that the facts they have alleged make this case parallel to *Frank* and demand the same result.[80]  Plaintiffs have alleged a long history of

---

2008).  Defendants do not raise *van der Fluit v. Yates*, 2017 WL 5953514 (Del. Ch. Nov. 30, 2017), which was issued by this Court after briefing on these motions concluded.  Regardless, *van der Fluit* also is distinguishable from the instant case.  In *van der Fluit*, this Court found that the plaintiff had not pled sufficient facts to make it reasonably conceivable that a control group existed. *Id.* at *6-7.  There the plaintiff attempted to show a "contract, common ownership, agreement, or other arrangement—to work together toward a shared goal" by pointing to (1) agreements with no relation to the actual transaction; (2) agreements entered into by the entirety of the stockholders instead of just the control group; or (3) agreements entered into by only a subsect of the control group.  *Id.* at *5.  Most importantly, the plaintiff pled no facts nor offered any explanation for why these agreements show the purported control group was bound together in a legally significant way rather than merely evidencing a concurrence of self-interest.  *Id.* at *6.  Nor did the plaintiff allege any other facts to support any connection between the members of the purported control group.  *Id.*

[80]  Defendants also cite several other Delaware cases where this Court determined no control group existed, but in these opinions this Court found that no control group existed after discovery and in factually different scenarios.  *See e.g. Frank v. Elgamal*, 2014 WL 957550, at *18-20 (Del. Ch. Mar. 10, 2014) (finding at the summary judgment stage that no control group existed before the sale of the company but that there was a dispute of material fact regarding whether a control group existed during the sale); *Zimmerman*, 62 A.3d at 676 (finding, after three days of trial, that no control group existed, but pointing out that this Court concluded at the summary judgment stage that it was possible to show that a control group did exist when the plaintiffs identified various communications to the board by the individual members of the purported control group); *In re PNB Hldg. Co. S'holder Litig.*, 2006 WL 2403999, at *10 (Del. Ch. Aug. 18, 2006) (finding, in a post-trial opinion, that no control group existed because the purported control group consisted of the directors and officers of the company who did not control a majority of the stock and "[t]o find that this board was a unified controlling stockholder would be unprincipled and create a negative precedent" because "[g]lomming share-owning directors together into one undifferentiated mass with a single hypothetical brain would result in an unprincipled Frankensteinian version of the already debatable 800-pound gorilla theory of the controlling stockholder that animates the *Lynch* line of reasoning.").

19

cooperation and coordination between the Controlling Defendants. This history began almost a quarter of a century ago when they entered into a voting agreement and declared themselves to the SEC as a "group" of stockholders in Quidel.[81] The history continued for another twenty-one years and included coordinating their investment strategy in at least seven different companies.[82] This history culminated, at least for the purposes of this action, in 2011 when they were the only participants in a private placement that made them the largest stockholders of Hansen.[83] In 2013 and 2015, they were defined together as "Principal Purchasers" in private placements of Hansen stock, enjoying "the right to determine the closing date, to oversee the press releases and other communications regarding the transactions, to extend the termination date under certain circumstances, and to amend the agreement."[84]

This history of coordination colors the actions of the Controller Defendants during the Merger. At a very early stage of the negotiations, the Controller Defendants were identified by Auris as the Key Stockholders and entered into agreements that allowed the Key Stockholders, but only the Key Stockholders, to

---

[81]    Compl. ¶ 36(a).

[82]    *Id.* ¶¶ 31, 36(a-f).

[83]    *Id.* ¶ 32.

[84]    *Id.* ¶ 35.

20

negotiate directly with Auris.[85]  The Proxy also states that "concurrently with entering into the merger agreement, and as an inducement to Auris . . . entering into the merger agreement, Auris, . . . and Hansen obtained voting agreements and irrevocable proxies from each of the [Controller Defendants]."[86]  These voting agreements and proxies required that "all shares beneficially owned by each such person" be voted "in favor of the adoption of the merger agreement and to otherwise support the merger."[87]  Finally, concurrently with the merger agreement, and contemporaneously with each other, the Controller Defendants also entered into stock purchase agreements with Auris that the minority stockholders did not sign.[88] Although each of these factors alone, or perhaps even less than all these factors together, would be insufficient to allege a control group existed, all of these factors, when viewed together in light of the Controller Defendants' twenty-one year coordinated investing history, make it reasonably conceivable that the Controller Defendants functioned as a control group during the Merger.

Defendants attempt to distinguish *Frank*, in part, by saying that the *Frank* Court "was not asked to decide whether the complaint in that case sufficiently

---

[85]     *Id.* ¶ 37.

[86]     Dir. Defs.' Opening Br. Ex. A, at 30, 87.

[87]     *Id.* at 30, 87.

[88]     *Id.* at 2.

21

alleged the existence of a control group."[89] This argument does not carry the day because the Vice Chancellor actually held that the complaint sufficiently alleged that the members of the control group were connected in a legally significant way and discussed the specific facts that allowed him to make that finding.[90] I am not convinced that the decision's precedential value depends on how vigorously the parties contested a particular point. Defendants try to distinguish *Frank* further by pointing out that in *Frank*, the Vice Chancellor relied on the fact that the purported control group had entered into employment contracts with the acquirer and that an equivalent fact does not exist here.[91] *Frank* did not set out the sole and conclusive arrangement of facts necessary to find adequate allegations that a control group existed. As discussed above, I find that the facts alleged here and the facts in *Frank* are sufficiently alike to dictate a similar result.

More broadly, Defendants attempt to negate Plaintiffs' pleadings by offering an alternative explanation for each fact pled by Plaintiffs. For example, Defendants point out that "Companies looking to raise capital routinely offer sophisticated investors known to invest in those Companies' sectors the opportunity to participate

---

[89]    S'holder Defs.' Reply Br. 11.

[90]    *Frank*, 2012 WL 1096090, at *8.

[91]    S'holder Defs.' Reply Br. 2.

in private placements."[92]   Defendants argue that because giving sophisticated investors the opportunity to invest in private placements is commonplace, and because Hansen allowed stockholders other than the Controller Defendants to participate, the private placements in 2013 and 2015 do not support a finding that a control group existed.[93]   Furthermore, Defendants argue that "Schuler and Feinberg are both longtime investors in the healthcare sector is irrelevant to whether the Stockholder Defendants allegedly colluded with respect to Hansen,"[94] and the Quidel Schedule 13D "demonstrates that when . . . Schuler and Feinberg have, in the past, entered into voting agreements between each other with respect to a contemporaneous investment, they disclosed such arrangements."[95]   Finally, Defendants argue that the Voting and Stockholder Agreements were between the Stockholder Defendants and Auris, not between the Stockholder Defendants themselves, which means they cannot evidence an agreement between the Stockholder Defendants.[96]   Defendants argue that their explanations for each fact undercuts Plaintiffs' alleged facts showing control.

---

[92]   S'holder Defs.' Opening Br. 24.

[93]   *Id.*

[94]   *Id.* at 25.

[95]   *Id.* at 26.

[96]   *Id.* at 27.   Defendants also argue that "the execution of the Voting Agreements suggests only that the [Controller] Defendants each approved of the transaction, a

23

Defendants offer reasonable explanations for some of the connections, parallel investments, and actions of the purported control group. One might even argue that they offer a more compelling version of events. It may well be that Defendants' version prevails at a later stage of litigation. At the motion to dismiss stage, however, the question is not whether Plaintiffs offer the only, or even the most, reasonably conceivable version of events. Rather, the question is whether Plaintiffs have stated a reasonably conceivable claim for which relief can be granted. "A court should deny a motion to dismiss pursuant to Court of Chancery Rule 12(b)(6) 'unless it can be determined with reasonable certainty that the plaintiff could not prevail on any set of facts reasonably inferable' from the pleadings."[97]

Finally, Plaintiffs have further alleged that the Controller Defendants received the opportunity to, and did, "rollover" their stock in Hansen into preferred stock in Auris.[98] The minority stockholders did not receive this benefit. Instead, Plaintiffs argue, the minority stockholders received an unfairly low price. Because Plaintiffs have stated a reasonable conceivable claim that the Controller Defendants

---

[97] fact which, standing alone, cannot support a control group inference." S'holder Defs.' Reply Br. 2. As discussed above, I do not look at a single fact alleged by Plaintiffs alone, but rather I look at the facts all together to conclude that Plaintiffs have stated a reasonably conceivable claim.

[97] *In re Primedia Inc. Deriv. Litig.*, 910 A.2d 248, 256 (Del. Ch. 2006) (quoting *Superwire.com, Inc. v. Hampton*, 805 A.2d 904, 908 (Del. Ch. 2002)).

[98] Compl. ¶ 79.

constituted a control group and that the control group received a non-ratable benefit, Plaintiffs have stated a reasonably conceivable claim that the entire fairness standard of review applies.

Entire fairness is "Delaware's most onerous standard."[99] "Once entire fairness applies, the defendants must establish 'to the court's satisfaction that the transaction was the product of both fair dealing and fair price.'"[100] Generally, the determination that the entire fairness standard of review could reasonably apply will prevent dismissal of an action at the motion to dismiss stage "because defendants do not have the luxury of arguing facts that would counter the plaintiffs' well-pled allegations that are assumed as true."[101] This is true here,[102] and I am precluded from dismissing the claims against the Controller Defendants at this stage.

---

[99] *In re Trados Inc. S'holder Litig.*, 73 A.3d 17, 44 (Del. Ch. 2013).

[100] *Id.* (quoting *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1163 (Del. 1995)).

[101] *In re Ezcorp*, 2016 WL 301245, at *30 (citing *Orman v. Cullman*, 794 A.2d 5, 20 n.36 (Del. Ch. 2002)).

[102] Plaintiffs allegations of an unfair process and unfair price are all the more poignant because a three-fourths majority of the non-rollover shares voted *against* the Merger. *See* Compl. ¶ 8. Plaintiffs argue that the Merger would not have gone through if it had been conditioned on approval by a majority of non-rollover shares. *Id.* ¶ 122.

## C. Plaintiffs have pled non-exculpated claims against Defendants Lowe, Vance, and Schuler

Under *Cornerstone Therapeutics Inc. Shareholder Litigation*, "plaintiffs must plead a non-exculpated claim for breach of fiduciary duty against an independent director protected by an exculpatory charter provision [adopted pursuant to 8 *Del. C.* § 102(b)(7)], or that director will be entitled to be dismissed from the suit."[103] An exculpatory charter provision, however, does not apply to claims of breaches of the duty of loyalty, claims against officers, or claims against controllers.[104] Plaintiffs concede that Hansen has an exculpatory charter provision.[105] But, Plaintiffs argue that all their claims fall outside the reach of *Cornerstone* because the claims either state a claim for breach of the duty of loyalty or are claims against Defendants in their capacity as an officer or controller. I agree. Plaintiffs have pled non-exculpated claims against Defendant Schuler in his capacity as a controller, Lowe for a violation of his duty of loyalty, and Vance in his capacity as an officer.

### 1. Plaintiffs have stated a reasonably conceivable non-exculpated claim against Defendant Schuler

Plaintiffs have stated a reasonably conceivable non-exculpated claim against Schuler for a breach of the duty of loyalty. "Essentially, the duty of loyalty mandates

---

[103]    115 A.3d 1173, 1179 (Del. 2015).

[104]    *See Chen v. Howard-Anderson*, 87 A.3d 648, 677-76 (Del. Ch. 2014).

[105]    Pls.' Opp'n Br. 48.

26

that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally."[106] Moreover, "[w]hen [the entire fairness] standard is invoked at the pleading stage, the plaintiffs will be able to survive a motion to dismiss by interested parties regardless of the presence of an exculpatory charter provision because their conflicts of interest support a pleading-stage inference of disloyalty."[107]

As discussed above, Plaintiffs have stated a reasonably conceivable claim that Schuler was part of a control group that competed with Hansen's minority stockholders for consideration during the Merger, resulting in a merger price for the minority stockholders that Plaintiffs argue was unfairly depressed. Thus, Plaintiffs have stated a reasonably conceivable claim that he violated his duty of loyalty. Therefore, Plaintiffs have stated a reasonably conceivable non-exculpated claim against Schuler.

### 2. Plaintiffs have stated reasonably conceivable non-exculpated claims against the Director Defendants

Plaintiffs have stated a reasonably conceivable non-exculpated claim for breach of fiduciary duties against the Director Defendants due to material

---

[106] *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993).

[107] *In re Cornerstone*, 115 A.3d at 1180–81.

27

misstatements and omissions in the Proxy.[108] "[D]irectors of a Delaware corporation have a fiduciary duty to disclose fully and fairly all material information."[109] "Under Delaware law, when a board chooses to disclose a course of events or to discuss a specific subject, it has long been understood that it cannot do so in a materially misleading way, by disclosing only part of the story, and leaving the reader with a distorted impression."[110] Instead, "[d]isclosures must 'provide a balanced, truthful account of all matters they disclose.' Partial disclosure, in which some material facts are not disclosed or are presented in an ambiguous, incomplete, or misleading manner, is not sufficient to meet a fiduciary's disclosure obligations."[111]

"An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote,"[112] or "[p]ut another way, there must be a substantial likelihood that the disclosure of the

---

[108]   Plaintiffs levy a plethora of allegations against Vance and Lowe. Because Plaintiffs have stated at least one reasonably conceivable claim against Lowe and Vance, I need not address all the additional allegations at this stage.

[109]   *Appel v. Berkman*, 180 A.3d 1055, 1060 (Del. 2018) (alteration in original) (quoting 1 R. Franklin Balotti & Jesse A. Finkelstein, The Delaware Law of Corporations and Business Organizations § 17.10[B], at 17–17 (3d ed. 1998)).

[110]   *Id.* at 1064.

[111]   *Id.* (internal citations omitted).

[112]   *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 944 (Del. 1985) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)).

28

omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."[113]

The Proxy included three valuations ranges calculated using DCFs. The DCFs used three separate management projections, Management Case 1, 2, and 3, resulting in three separate valuations. On the one hand, the DCF prepared using Management Case 1 showed a "range of implied present value per share" of $5.78-$7.68, which was well above the transaction price of $4.00 per share.[114] On the other hand, the DCFs prepared using Management Case 2 and 3 showed "range[s] of implied present value per share" at or below the transaction price.[115]

Lowe testified in his deposition that Management Case 1 was considered by management to be the most likely scenario and that Management Cases 2 and 3, which lead to DCFs with values lower than the merger price, were included *only* to keep the CFO from "looking stupid."[116] But, the Proxy states that "[i]n the view of our management, the financial projections were prepared on a reasonable basis reflecting management's best available estimates and judgments regarding our

---

[113] *Id.* (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)).

[114] Dir. Defs.' Opening Br. Ex. A, at 58.

[115] *Id.*

[116] *Id.*

future financial performance."[117] The actual opinion of management, as expressed by Lowe under oath, was not included in the Proxy. In fact, the Proxy presents all three scenarios as equally plausible in management's opinion. The fact that management considered one valuation most likely and included the other two valuations just to keep the CFO from "looking stupid" likely "would catch a reasonable stockholder's attention and 'significantly alter[] the total mix of information.'"[118] This makes it reasonably conceivable that the Proxy was materially misleading.

### a. Defendant Lowe

Plaintiffs have stated a reasonably conceivable claim that Lowe breached his duty of loyalty in his capacity as a director. Lowe prepared the management projections in his capacity as interim CFO.[119] Based on the facts pled by Plaintiffs, it is reasonably conceivable that Lowe knew the Proxy was materially misleading and breached his duty of loyalty by allowing the Proxy to go to stockholders. The exculpatory provision does not protect Lowe from breaches of the duty of loyalty, and thus, Plaintiffs have stated a non-exculpated claim against him.

---

[117]    *Id.* at 48.

[118]    *Appel*, 180 A.3d at 1061 (alteration in original) (quoting *Rosenblatt*, 493 A.2d at 944.).

[119]    Compl. ¶ 100.

30

### b. Defendant Vance

Plaintiff has stated a reasonably conceivable claim that Vance violated his fiduciary duty in his capacity as an officer. "The duty of disclosure is, and always has been, a specific application of the general fiduciary duty owed by directors."[120] "The fiduciary duties of officers are the same as those of directors."[121] Vance affixed his signature to the Proxy in his capacity as President and CEO and presented the information to the stockholders for their consideration. This means he may be liable for material misstatements in the Proxy in his capacity as an officer in addition to his capacity as a director. As discussed above, Plaintiffs have stated a reasonably conceivable violation of the duty of disclosure. The exculpatory provision does not protect Vance from breaches of his fiduciary duties in his capacity as an officer; thus, Plaintiffs have pled non-exculpated claims against Vance.

### D. Plaintiffs have not stated a reasonably conceivable claim against Auris for aiding and abetting a breach of fiduciary duty

Plaintiffs have not stated a reasonably conceivable claim for aiding and abetting of fiduciary duty against Auris because they have not pled facts that show Defendant Auris knowingly participated in the purported breach by the other Defendants. There are four elements to state "an aiding and abetting claim: '(1) the

---

[120] *Malone v. Brincat*, 722 A.2d 5, 10 (Del. 1998).

[121] *Gantler v. Stephens*, 965 A.2d 695, 709 (Del. 2009).

31

existence of a fiduciary relationship, (2) a breach of the fiduciary's duty, . . . (3) knowing participation in that breach by the defendants,' and (4) damages proximately caused by the breach."[122] "Knowing participation in a board's fiduciary breach requires that the third party act with the knowledge that the conduct advocated or assisted constitutes [a breach of fiduciary duty]."[123] "[T]he requirement that the aider and abettor act with scienter makes an aiding and abetting claim among the most difficult to prove."[124] The "long-standing rule [is] that arm's-length bargaining is privileged and does not, absent actual collusion and facilitation of fiduciary wrongdoing, constitute aiding and abetting."[125] "Under this [rule], a bidder's attempts to reduce the sale price through arm's-length negotiations cannot give rise to liability for aiding and abetting."[126] The rule requires "that the third party knowingly participate in the alleged breach-whether by buying off the board in a side deal, or by actively exploiting conflicts in the board to the detriment of the

---

[122] *Malpiede v. Townson*, 780 A.2d 1075, 1096 (Del. 2001) (alteration in original) (quoting *Penn Mart Realty Co. v. Becker*, 298 A.2d 349, 351 (Del. Ch. 1972)).

[123] *Id.* at 1097.

[124] *RBC Capital Mkts., LLC v. Jervis*, 129 A.3d 816, 865–66 (Del. 2015).

[125] *Morgan v. Cash*, 2010 WL 2803746, at *8 (Del. Ch. July 16, 2010).

[126] *Malpiede*, 780 A.2d at 1097–98.

32

target's stockholders."[127]  This "rule protects acquirors, and by extension their investors, from the high costs of discovery where there is no reasonable factual basis supporting an inference that the acquiror was involved in any nefarious activity."[128]

Plaintiffs failed to plead facts that make it reasonably conceivable that Auris knowingly participated in any of the alleged breaches of fiduciary duty.  The Complaint does not include well-pled facts that Auris took part in any "nefarious" activity.  The facts in the Complaint show only that Auris negotiated a not-uncommon agreement to reduce its cash outlay by having the major investors in Hansen rollover their stock.  Plaintiffs offer the conclusory allegation that "Auris exploited its existing relationship with the Controller Defendants, and effectuated a merger in which Hansen's Control Group (i.e., the Controller Defendants), or alternatively Defendant Schuler alone, received a benefit not shared with the minority stockholders, and which was unfair to minority stockholders."[129]  But, Plaintiffs plead no facts to support that Auris knew of, let alone "exploited," any conflicts.  Finally, Plaintiffs allege that Auris negotiated directly with the Key

---

[127]    *Morgan*, 2010 WL 2803746, at *8.

[128]    *Id.*

[129]    Compl. ¶ 7.

Stockholders.[130]  The Proxy supports this,[131] but this fact alone does not support a reasonable inference that Auris "colluded" with the Controller Defendants.  Because the Complaint does not state well-pled facts that make it reasonably conceivable Auris partook in more than arm's length negotiations, Plaintiffs have not stated a reasonably conceivable claim for aiding and abetting breaches of fiduciary duty against Auris.

## III.    CONCLUSION

For the foregoing reasons, the Controller Defendants' Motion to Dismiss is DENIED, the Director Defendants' Motion to Dismiss is DENIED, and Defendant Auris's Motion to Dismiss is GRANTED.

**IT IS SO ORDERED**.

---

[130]    *Id.* ¶ 61; Pls.' Opp'n Br. 55-56.

[131]    Dir. Defs.' Opening Br. Ex. A, at 37.